COUNTY OF LOS ANGELES,
Plaintiff–Appellant,

v.

Louis W. SULLIVAN, M.D., Secretary
of Health and Human Services,
Defendant–Appellee.

No. 90–55253.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 10, 1991.

Submission Withdrawn May 20, 1991.

Resubmitted June 22, 1992.

Decided June 29, 1992.

Margaret M. Manning, Weissburg & Aronson, Los Angeles, Cal., for plaintiff-appellant.

Barbara Helen Fisher, Baltimore, Md., for defendant-appellee.

Before TANG, REINHARDT and WIGGINS, Circuit Judges.

TANG, Circuit Judge:

The County of Los Angeles ("County") challenges the validity of a rule promulgated by the Secretary of Health and Human Services ("Secretary") that limited the amount of reimbursement received by three of the County's hospitals for treating Medicare patients for the fiscal years 1974 through 1980. The County contends that the rule (1) conflicts with the Secretary's statutory mandate to provide the three hospitals with the "reasonable costs" of their services, (2) ignores statutes and regulations requiring the Secretary to accommodate hospitals' accounting capabilities, and (3) violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, because the Secretary did not abide by the APA's rule-making requirements. The County initially appealed the rule to the Provider Reimbursement Review Board ("PRRB"), an administrative tribunal with jurisdiction over Medicare reimbursement disputes. *See* 42 U.S.C. § 1395*oo*. After the PRRB upheld the rule, the County filed an action for judicial review of the PRRB's decision in district court pursuant to 42 U.S.C. § 1395*oo* (f). The district court granted summary judgment for the Secretary, and the County timely appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse and remand.

## I

### BACKGROUND

Under the Secretary's administration, the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395ccc, provides federal health insurance

for elderly and disabled people. Until 1980, federal law required the Secretary to reimburse certified Medicare health care providers such as hospitals the "reasonable cost" of serving Medicare patients. *Id.* § 1395f(b). Participating hospitals submitted their Medicare cost reports to "fiscal intermediaries," private agents of the Secretary, which reviewed each report for compliance with Medicare regulations and interpretive rules. *Id.* § 1395h; 42 C.F.R. § 405.453(f).

The Medicare program reimburses hospitals for "routine services" and "ancillary services." Routine services include room and board and the minor medical supplies every patient receives. 42 C.F.R. § 405.-452(b). Routine services are reimbursed at an average per diem rate for each day the hospitals serve Medicare patients. *Id.* § 405.452(d)(7).

Ancillary services are "services for which charges are customarily made in addition to routine services," and include such services as x-rays and laboratory tests. *Id.* § 405.452(b). Because of characteristics unique to the Medicare population, Congress and the Secretary rejected the use of a hospital's average per diem rate for reimbursing ancillary services. The average elderly Medicare patient stays twice as long in the hospital as all other patients, but does not use more ancillary services. Medicare patients' average per diem ancillary costs differ from, and are generally lower than, other patients' average per diem ancillary costs. *See id.* § 405.403(e).

Congress delegated to the Secretary the responsibility of devising cost-apportionment procedures that would ensure that the costs of treating Medicare patients would not be borne by non–Medicare patients and vice versa. *See* 42 U.S.C. § 1395x(v)(1)(A). Thus, to account for the atypical ancillary costs of the Medicare population, the Secretary developed in 1968 five alternative methods for reimbursing ancillary costs. DHEW Intermediary Letter No. 321 (April 1968). The five methods also accommodated different hospitals' billing practices and sophistication in recordkeeping. *Id.* The methods were in effect from 1968 to 1980, and thus applied to the years disputed in this action, 1974 to 1980. *Id.*

Method A, the most sophisticated and "preferred" method, required hospitals to calculate the ratio of Medicare patients' ancillary costs to all other patients' ancillary costs. *Id.* This method applied to hospitals, including most private hospitals, that billed separately for ancillary costs. *Id.*

The Secretary promulgated four other calculation methods, Methods B, C, D, and E, for hospitals with less sophisticated recordkeeping. *Id.* Such hospitals included public, multi-institutional systems which provide services for small or no charges. *Id.* At the Medicare program's inception, such hospitals did not account for routine and ancillary service costs separately. Instead, they used an "all-inclusive" rate structure, posting a single per diem rate for all services provided. *Id.* Because of inadequate data, such hospitals could not use the preferred Method A for calculating Medicare reimbursable ancillary costs. Los Angeles County operated an "all inclusive" hospital system unable to use Method A. During the period 1968 to 1980, Los Angeles County hospitals in this system used Method B.

The accounting rules initially promulgated by the Secretary in 1968 required all providers to implement data collection and billing procedures that would enable them to use Method A by December 1969. DHEW Intermediary Letter No. 321 (April 1968). In 1971, however, the Secretary, through a designated fiscal intermediary contractor, Blue Cross Association, issued a "Medicare Administrative Bulletin" extending indefinitely the deadline for converting to Method A. Administrative Bulletin No. 378 (April 8, 1971). The Bulletin authorized fiscal intermediaries such as Los Angeles County's to grant extensions to government hospitals authorizing use of alternative Methods B through E if the hospitals were "unable to implement Method A because of the failure to secure adequate funding from the pertinent legislature." *Id.* Accordingly, from 1969 to

1980, Los Angeles County sought and received permission from its designated fiscal intermediary to continue using alternative Method B.

Under Method B, hospitals calculated a weighted estimated percentage of Medicare patients' use of ancillary services based on a ratio of the Medicare patients' average length of stay to the average length of stay of all of the hospital's patients.[1] Method B relied on two premises to account for the Medicare population's atypical ancillary costs. First, patients generally receive more ancillary services in the early stages of hospitalization resulting in higher costs in the early days of each patient's stay. DHEW Intermediary Letter No. 321 (April 1968). Second, Medicare patients typically remain hospitalized twice as long as other patients, but require fewer ancillary services over the latter part of the hospital stay. 42 C.F.R. § 405.403(e). Thus, under these premises, because Medicare patients' ancillary costs are averaged over longer stays, their average per diem ancillary costs are lower than the average per diem ancillary costs for all patients. *Id.*

Accordingly, under Method B, if a patient's hospital stay exceeded the hospital's average for all patients, then the Medicare program reimbursed the hospital for only seventy-five percent of average per diem ancillary costs for each day the Medicare patient's stay exceeded the hospital's average. Conversely, if a Medicare patient's stay was shorter than the hospital's average stay for all patients, then the Medicare program reimbursed the hospital for an amount greater than the average per diem ancillary costs for all patients.

In October 1971, the Secretary modified Method B to provide that a hospital's reimbursement for a Medicare patient's per diem ancillary costs could not exceed 100% of the hospital's average per diem ancillary costs for all patients.[2] Method B thus continued to reflect the premise that Medicare patients with hospital stays longer than non-Medicare patients' stays have lower per diem ancillary costs because ancillary costs are greater in the early part of all patients' stays. Method B ceased to reflect the corollary, however, that when Medicare patients' stays were shorter than the hospital's average, their per diem ancillary costs were higher than the hospital's average for all patients.

The modification effectively reduced Medicare reimbursable costs for the three Los Angeles County specialty hospitals,

---

1. As promulgated in 1968, Method B provided:
   B.  *Sliding Scale Method B*—In the absence of charges or statistical data, a hospital may use the sliding scale method to determine ancillary costs, with routine service costs determined on an average per diem cost basis. Total allowable costs should be allocated between routine and ancillary services through step-down cost finding, or by using the estimated percentage basis where permitted.
   When using the sliding scale method to determine Medicare ancillary costs, the hospital would:
   1.  determine the average length of stay of all patients;
   2.  determine the average length of stay for patients 65 years or older;
   3.  calculate the average per diem allowable ancillary costs for all patients;
   4.  determine the weighted average percentage of average per diem ancillary costs for Medicare patients in the following manner:
   a.  multiply the average length of stay for all patients by 100 percent to determine a weighted percentage;
   b.  the difference in the number of days between the average length of stay for patients 65 years or older and the average length of stay for all patients must be multiplied by 75 percent to determine a weighted percentage;
   c.  The total of a and b above will produce a total weighted value for the average length of stay for patients 65 years or older. This weighted value must be divided by the average length of stay for patients 65 years or older to produce the percentage to be applied to the ancillary average per diem cost.
   DHEW Intermediary Letter No. 321 (April 1968); Prov.Reimb.Man., Part 1 § 2208.1(B) (1984).

2. The modification to Method B, termed the "100% limitation," consists of the following added provision:
   This [weighted ancillary] percentage can be less than, but cannot exceed, 100 percent of the average ancillary per diem cost. Where the average length of stay of Medicare inpatients is less than the average length of stay for all inpatients, the percentage derived under this formula would be 100 percent.
   Prov.Reimb.Man., Part 1 § 2208.1(B) (1984).

Rancho Los Amigos, Long Beach General, and Mira Loma, for every year they utilized Method B. These hospitals provide rehabilitative services for alcoholics, for people with spine or brain injuries, or for children. Because of their specialties, these three hospitals' patient populations and length of stay averages were atypical. In these three hospitals, Medicare patients remained in the hospital for a shorter stay than each hospital's average for all patient stays. Thus, these hospitals had average per diem Medicare ancillary services costs that were higher than all patients' average per diem costs for ancillary services.

In 1981 the three affected County hospitals filed a group appeal with the PRRB pursuant to 42 U.S.C. § 1395oo. The hospitals challenged the application of the modified Method B containing the 100% limitation to their cost reports for Medicare reimbursement for fiscal years 1974 through 1980.

The PRRB initially declined to hear most of the claims on the ground that it lacked jurisdiction over any claims that the hospitals had self-disallowed under Method B in reports to the fiscal intermediary in prior years. On the merits, the PRRB reviewed the two premises underlying Method B: first, that patients receive more ancillary services in the early part of their hospital stays, and second, that Medicare patients require fewer ancillary services during the later part of their hospital stays. The PRRB held that the County hospitals had a burden to demonstrate that those assumptions are either not correct or not applicable in this case. The PRRB found that the County hospitals had not demonstrated either why their Medicare lengths of stay were shorter or that Medicare patients recovered faster from the same illnesses. The PRRB therefore denied the appeal.

On August 7, 1985, the County filed the instant suit on behalf of the three hospitals against the Secretary challenging the 100% limitation in Method B. The parties filed cross motions for summary judgment, and on August 1, 1988, the district court held a hearing on these motions. The district court determined that the PRRB should not have declined jurisdiction over any of the hospitals' claims because a Medicare provider's "self-disallowance" of charges pursuant to Medicare regulations does not deprive the PRRB or the district court of jurisdiction. See Bethesda Hosp. Ass'n. v. Bowen, 485 U.S. 399, 404–05, 108 S.Ct. 1255, 1258–59, 99 L.Ed.2d 460 (1988). As a result of this jurisdictional error, the district court remanded the case to allow the PRRB to develop an adequate administrative record, but retained jurisdiction over the suit. The PRRB agreed it had jurisdiction over all of the County's claims, but declined to take further action. After the Secretary decided neither to reverse, affirm, nor modify the PRRB's decision, the PRRB's decision became final. See 42 U.S.C. § 1395oo (f). The County renewed its challenges in the district court which granted summary judgment in favor of the Secretary. This appeal followed.

II

STANDARD OF REVIEW

We review the district court's summary judgment de novo. Kruso v. International Tel. & Tel., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).

In our de novo review of the district court's summary judgment, we examine the record developed before the PRRB, paying deference to the Secretary's interpretation of the Medicare program. See Regents of Univ. of Cal. v. Heckler, 771 F.2d 1182, 1187 (9th Cir.1985).

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, governs our review of the PRRB's decision. See 42 U.S.C. § 1395oo (f). We may not reverse the PRRB's decision unless it is in excess of statutory authority, arbitrary, capricious, an abuse of discretion, or is inconsistent with the law. 5 U.S.C. § 706; see also Regents of Univ. of Cal., 771 F.2d at 1187. We will abide by the PRRB's fact findings so long as they are supported by substantial evidence. See NLRB v. Howard Elec. Co., 873 F.2d 1287, 1290 (9th Cir.1989).

Although we give deference to the Secretary's interpretation of Medicare statutes and regulations, this interpretation is without force of law and must sensibly conform to the wording of the statutes and regulations. *Vista Hill Found., Inc. v. Heckler*, 767 F.2d 556, 559–60 (9th Cir.1985). Thus, the Secretary's interpretation will not be upheld if it is inconsistent with Medicare statutes and regulations. *Id.* at 560. Finally, although we normally may affirm a district court's grant of summary judgment on any basis with support in the record, we may only affirm an agency decision on a ground that the agency actually relied on in reaching that decision. *Id.* at 559.

## III

## DISCUSSION

A. The Statutory Requirement of Reimbursement for the "Reasonable Cost" of Medicare Ancillary Services and the Prohibition Against Shifting These Costs to Non–Medicare Patients.

■ The County argues that the 100% limitation engrafted onto Method B contravened two unequivocal congressional mandates. First, the County argues that the 100% limitation violates the Secretary's statutory mandate to pay Medicare providers the "reasonable cost" of their ancillary services. By statute, the "amount paid to any provider of services ... shall ... be ... the reasonable cost of such services, as determined under section 1395x(v)." 42 U.S.C. § 1395f(b). "The reasonable cost of any services shall be the cost actually incurred...." *Id.* § 1395x(v)(1)(A). The County contends that the 100% limitation failed to reflect that certain Medicare patients incurred higher than average per diem ancillary costs, and thus prevented the three hospitals from recouping all the ancillary costs attributable to Medicare patients. The 100% limitation as applied to the three hospitals, the County concludes, therefore violated the statutory mandate of sections 1395f(b) and 1395x(v)(1)(A) to pay Medicare providers their reasonable costs.

The County also argues that the 100% limitation violated the congressional prohibition against reimbursement formulas which shift Medicare costs to non-Medicare patients. By statute, the Secretary must promulgate reimbursement regulations which assure that "the necessary costs of efficiently delivering covered services to individuals covered by [Medicare] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by [Medicare]." 42 U.S.C. § 1395x(v)(1)(A). By preventing reimbursement for the higher cost of Medicare ancillary per diem care, the County argues, the 100% limitation impermissibly forced non-Medicare patients, or the County itself, to bear costs attributable to Medicare patients at the three hospitals in question.

The PRRB rejected these arguments because it concluded that the three County hospitals had "not demonstrated either why their Medicare lengths of stay were shorter or that their Medicare patients recovered faster from the same illnesses." The Secretary therefore argues that the County failed to prove the factual premises of its case before the PRRB. We disagree.

For purposes of Medicare reimbursement, the three hospitals need not have proved why their Medicare patients stays were shorter or why their Medicare patients recovered faster. The hospitals need only have demonstrated that their Medicare patients did stay for shorter periods than their non-Medicare patients on the average. The Secretary concedes that Medicare patients' stays were shorter than the non-Medicare patients' average length of stay in these hospitals. Accordingly, the PRRB's findings about why Medicare patients' stays were shorter are irrelevant.

■ The Secretary argues further, however, that even if the County has shown that Medicare patients' stays were shorter than the average at the three hospitals, it failed to prove that its Medicare patients' per diem ancillary costs were higher than the average per diem ancillary costs. Indeed, there is no evidence of actual costs. The district court also emphasized in its order that the County bore the burden of establishing its reimbursable costs in its

cost reports to the fiscal intermediary. *See* 42 C.F.R. § 405.453(a).

The demand that the County produce evidence of its actual costs would seem reasonable if Method B required proof of actual costs. The Secretary designed Method B, however, for precisely those circumstances where hospitals were incapable of producing actual data. Pursuant to statutory authority, therefore, the Secretary designed Method B to function from assumptions and per diem averages. *See* 42 U.S.C. § 1395x(v)(1)(A). Accordingly, the County does not need to prove actual costs but may rely on its per diem averages and Method B's assumptions.

■ The parties agree on the validity of Method B's fundamental assumptions: Medicare patients stay hospitalized longer than average; all patients' ancillary costs are higher at the start of a stay; therefore, Medicare patients who stay longer than average incur lower than average per diem ancillary costs. *See* 42 C.F.R. § 405.403(e). The County argues that if this assumption is valid, then its corollary also must be valid: if Medicare patients' hospital stays are shorter than average, and all patients' ancillary costs are higher at the start of a stay, then Medicare patients whose stays are shorter than average must incur higher than average per diem ancillary costs. We agree.

■ The Secretary may not use an assumption where it would result in lower costs to the Medicare program, but reject its corollary where it would result in higher costs to the Medicare program. *See Reimbursement Guidelines for Medicare: Hearing Before the Committee on Finance* 89th Cong., 2d Sess. 91 (1966) ("it would not seem reasonable to apply averages where they work in favor of the Government while denying their use where they might work in favor of providers"). Thus, if the assumption that ancillary costs are higher in the early part of all patients' stays is valid to lower Medicare program costs where Medicare patient stays were longer than average, then the same assumption also must operate to increase Medicare program costs where, as in the case of these three hospitals, Medicare patient stays were shorter than average.

The Secretary counters that the corollary—Medicare patients with shorter than average length of stays incur higher than average per diem ancillary costs—is unsupported by actual data. Actual data, however, does not support Method B's assumption that Medicare patients who stay longer than average incur lower than average per diem ancillary costs either. Instead, Method B depends on assumptions, not actual data. The Secretary cannot work Method B's underlying assumptions to the government's favor and deny the County the benefit of the assumptions' necessary corollary.

In compliance with Method B's assumptions and necessary corollary, the County has proven that Medicare patients in its three specialty hospitals incurred higher than average per diem ancillary costs. Pursuant to statute, the Secretary may neither restrict payment to the hospitals of the reasonable costs of ancillary services, nor shift these costs to non-Medicare patients or the providers themselves. *See* 42 U.S.C. §§ 1395f(b) & 1395x(v)(1)(A). Accordingly, because the 100% limitation unnecessarily restricts reimbursement for ancillary services provided to Medicare patients, we hold that it contravenes the statutory requirements that the Secretary reimburse the hospitals for their reasonable costs and not shift Medicare patients' costs to non-Medicare patients or the hospitals themselves.

### B. Accommodation of the Three Hospitals' Accounting Capabilities.

■ The County also argues that Method B's 100% limitation violated statutes and regulations requiring the Secretary to accommodate hospitals' accounting capabilities.

The parties agree that Method B's 100% limitation functions reasonably when Medicare patients' stays are longer than average. Because the three hospitals' Medicare patient stays were shorter than average, their situation was atypical, and the 100%

limitation prevented reimbursement to the three hospitals of all of their Medicare ancillary costs. The district court held, however, that nothing compelled the Secretary to design a reimbursement formula for aberrational or atypical cases. The district court reasoned that if Method B with its 100% limitation ill-served the atypical three hospitals, the three hospitals should have converted to the actual cost method of Method A rather than challenged the 100% limitation in Method B. The district court and the PRRB rejected the County's argument, finally, because of their expansive view of the Secretary's discretion in designing reasonable cost reimbursement methods. In their view, the Secretary had the discretion to design reimbursement methods which would not fully reimburse hospitals' costs in atypical cases. We disagree.

■ Congress determined that the "reasonable cost of any services shall be the cost actually incurred." 42 U.S.C. § 1395x(v)(1)(A). Congress also authorized the Secretary to promulgate "regulations establishing the method or methods to be used ... in determining such costs." *Id.* Congress anticipated and approved the use of averages or surrogates for actual costs:

> "Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific claims or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by [Medicare], and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs."

*Id.* In sum, Congress authorized the Secretary to promulgate all manner of reimbursement calculation methods so long as they reasonably reflected actual costs.

In implementing this congressional mandate, the Secretary promulgated certain "tests and objectives" applicable to all cost reimbursement methods. 42 C.F.R. § 405.-402(a), (b). Among these tests and objectives, the regulations required that "there be sufficient flexibility in the methods of reimbursement to be used, particularly at the beginning of the [Medicare] program, to take account of the great differences in the present state of development of recordkeeping." *Id.* § 405.402(b)(4).

Thus statutory and regulatory authority required promulgation of a reimbursement method that reasonably estimated Medicare ancillary costs in atypical cases such as these three hospitals where Medicare patients' stays were shorter than average. The statute required the Secretary to pay reasonable costs to each provider. The regulations further required the Secretary to design flexible reimbursement methods. Moreover, the regulations also required the Secretary to recognize that "the relative use of services by aged patients as compared to other patients differ significantly among institutions." *Id.* § 405.403(f). Recognition of this factor also requires consideration of the equity "of the apportionment method under the program in accomplishing the objective of paying each provider fully." *Id.* Congress and the Secretary's own regulations thus compelled the Secretary to provide a reimbursement method which would account for the three hospitals' atypical circumstances.

■ The Secretary argues that he did provide for atypical cases in every method except Method B. Indeed, the greater accuracy of Method A assured consideration of all the factors Method B should have included. Thus, the Secretary argues, even if Method B with the 100% limitation could not assure the three hospitals reimbursement for all Medicare ancillary costs, pursuant to the regulations, the Secretary provided the hospitals with alternatives. The Secretary further argues that the County should not complain of shortcomings in the 100% limitation in Method B when the County itself petitioned to continue to use the method instead of converting to Meth-

od A as the Secretary encouraged. The Secretary asserts that the County continued to use Method B only because of his "largesse" in tolerating the County's procrastination in converting to the more accurate Method A. In sum, the Secretary argues that the County cannot complain of unreimbursed costs when the County itself failed to implement an available method which would have assured reimbursement even in atypical cases.

Had the County calculated which method would be most cost effective and freely chosen among the alternatives accordingly, the Secretary's arguments might prevail. The County might then reasonably bear the disadvantages of its chosen method. Instead, the Secretary required the County to use the most sophisticated method possible, in this case Method B. *See* DHEW Intermediary Letter No. 321 (April 1968). The County, therefore, had no recourse to Methods C, D, or E. *See id.* Moreover, the Secretary's agent, the fiscal intermediary, continued to allow the County to use Method B rather than covert to Method A. The fiscal intermediary required a showing that the County could not afford recordkeeping improvements necessary to implement Method A before it granted the County continued permission to use Method B. Specifically, the fiscal intermediary was authorized to grant extensions to government hospitals, on a temporary basis beyond December 1969, for use of Method B if the pertinent legislature had failed to provide sufficient funding to implement the recordkeeping necessary to use Method A. Administrative Bulletin No. 378 (April 8, 1971). Under these circumstances, the County used Method B, not because of the Secretary's alleged largesse or its own cost-benefit analysis, but rather because Method B was the only financially feasible method available to it.

The 100% limitation prevents reimbursement of "reasonable" Medicare ancillary costs, *see* 42 U.S.C. § 1395x(v)(1)(A), because it fails to take into account the "relative use by aged patients" of atypical hospitals such as these three, *see* 42 C.F.R. § 405.403(f). Although Method A may have provided the County with full reim-

bursement, the Secretary's regulations required "sufficient flexibility in the methods of reimbursement ... to take account of the great differences in ... recordkeeping." 42 C.F.R. § 405.402(b)(4). Because inadequate funding for recordkeeping forced the County to use Method B, the County is nonetheless entitled to reasonable reimbursement for its Medicare costs.

■ The Secretary counters that the regulation required flexibility in reimbursement methods to accommodate inadequate recordkeeping "particularly at the beginning of the program." *See id.* Yet certainly the Secretary could reasonably expect all Medicare providers, even public ones, to adopt more sophisticated recordkeeping methods eventually. The Secretary complains that the County took twelve years to convert to Method A. Assuming the Medicare program's survival for many decades, however, then its first twelve years may be considered the mere "beginning of the program." Moreover, we have not been shown nor have we found any basis, statutory or otherwise, for penalizing a hospital's failure to convert to the Secretary's preferred reimbursement Method A. Thus, to the extent that the 100% limitation in Method B penalized the County for its failure to convert to Method A more quickly, the 100% limitation was both contrary to and in excess of the Secretary's authority.

## IV

### CONCLUSION

The Secretary has neither explained the purpose of the 100% limitation fully nor provided a justification for its conflict with statutory and regulatory requirements. The Secretary defends the 100% limitation as reasonably reflecting the assumption that Medicare patients stay longer in hospitals than the average. Method B, however, reflected that assumption before the Secretary imposed the 100% limitation.

The only defense the Secretary offers for application of the 100% limitation to the three specialty hospitals here is that, if the

method ill-served them, they should have converted earlier to the preferred Method A. This rationale ignores the statutory and regulatory mandates that the Secretary reimburse reasonable costs while accommodating hospitals' varying capacities for recordkeeping. Accordingly, we conclude that the 100% limitation contravenes both congressional and the Secretary's own mandates, and that the district court erred by granting summary judgment in favor of the Secretary.[3]

We reverse and remand the district court's summary judgment for calculation of the hospitals' Medicare reimbursement under Method B without the 100% limitation.

REVERSED and REMANDED.

---

**3.** Because we find the 100% limitation to be invalid, we need not address the County's contention that the Secretary adopted the limitation without abiding by the rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. § 553.