**LOUISIANA–PACIFIC CORPORATION, WESTERN DIVISION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOUISIANA–PACIFIC CORPORATION, WESTERN DIVISION, Respondent.**

Nos. 93–70829, 93–70887.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 16, 1995.

Decided April 11, 1995.

Robert G. Hulteng, Littler, Mendelson, Fastiff, Tichy & Mathiason, San Francisco, CA, for petitioner-respondent.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, William A. Baudler, N.L.R.B., Washington, DC, for respondent-petitioner.

Before: GOODWIN, CANBY, and T.G. NELSON, Circuit Judges.

GOODWIN, Circuit Judge:

The National Labor Relations Board ("the Board") charged Louisiana–Pacific Corporation, Western Division ("the Company") with a number of unfair labor practices under the National Labor Relations Act ("Act"), 29 U.S.C. § 151, *et seq.* An Administrative Law Judge ("ALJ") found the Company in violation of the Act. With modifications discussed below, the Board affirmed the ALJ's "rulings, findings, and conclusions." [1] In a narrow petition for review, the Company challenges only a backpay order based on the Board's finding that the Company violated

---

1. The Board's order is reported at 312 NLRB No. 35.

Section 8(a)(5) [2] of the Act when it revoked a non-contractual agreement to "red-circle" the wages of seven employees. In its cross-petition, the Board seeks to have its order enforced in its entirety.

We enforce the uncontested aspects of the Board's order. We cannot understand the basis for the contested backpay order. Accordingly, we remand the cause to the Board so that the backpay order may be clarified.

## I. BACKGROUND

The Company operates a pulp mill and a sawmill in Samoa, California. In August 1991, the Company resolved to shut down the pulp mill's power boiler, thereby eliminating the jobs of thirty-seven employees. During an August 14, 1991 Standing Committee meeting, the Company and the Union discussed the fate of the thirty-seven power boiler employees.

At issue was application of a so-called "red circle" provision contained in the parties' collective bargaining agreement:

In the event Company permanently eliminates an established regular job classification, those employees with five (5) or more years of service in the mill who occupied that job classification at the time it was eliminated shall not have their straight-time hourly rate reduced below that of the eliminated classification at the time of discontinuance unless they refuse to accept a promotion or refuse to bid for available job openings. . . .

This provision draws a protective "red circle" around the wage rate of an employee who, because his former *job classification* is eliminated, must transfer into an otherwise lower-paying job. Thirty of the thirty-seven employees who lost their power boiler jobs also had their job classifications eliminated; they were covered by a literal interpretation of the red-circle provision. The remaining seven employees lost their power boiler jobs but not their job classifications; they were not covered by a literal interpretation of the red-circle provision. At the August 14 Standing

Committee meeting, the Company agreed to expand its interpretation of the red-circle provision so that all thirty-seven employees affected by the power boiler shutdown would receive red-circle benefits.

Shortly thereafter, two Caterpillar operators who had lost their jobs in the Company's "chip dump" department requested that their wages be red-circled. Because the two Caterpillar operators had not had their job classifications eliminated, the Company declined the request. The Company explained to the Union that it was willing to continue providing expanded red-circle benefits to the seven former power boiler employees, but that it wanted to "build a fence" around them. All other employees, including the two Caterpillar operators, would be provided red-circle benefits only in the event their job classifications were eliminated.

At the September 20 Standing Committee meeting, the Union rejected the Company's proposal to "build a fence" around the seven former power boiler employees. The Union understood the August 14 agreement quite differently, and saw no reason to change it. According to the Union, that agreement entitled *all* employees to the expanded red-circle treatment. The Union told the Company that it would not enter into any "new" agreement on the subject of red-circle rates.

By letter dated September 26, the Company notified the Union that it intended to put an end to expanded red-circle treatment altogether, and would bring all employees back under a literal interpretation of the collective bargaining agreement's red-circle provision. Effective October 4, the seven former power boiler employees whose job classifications had not been eliminated would no longer receive red-circle benefits. The Union did not respond to this letter. The Company continued to pay the seven former power boiler employees red-circle rates through October 3. On October 4, the Company implemented the change it had announced.

---

**2.** Section 8(a)(5) provides that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158(a)(5).

## II. THE AGENCY DECISIONS

The ALJ found that the August 14 agreement to expand red-circle benefits beyond the literal terms of the collective bargaining agreement created a new term and condition of employment. The ALJ then agreed with the Union's interpretation of the August 14 agreement: that the agreement had extended expanded red circle treatment to *all* employees, including the two Caterpillar operators.

What the ALJ found next exacerbated the present controversy:

To be sure, [the August 14] agreement was not necessarily unlimited in duration. Like any non-contractual term and condition of employment, qualifications for red-circle rate benefits could be changed through the process of negotiations. *However, a party is not free to utilize already conferred benefits of a term or condition of employment as a lever to extract changes or limitations in that employment term's prospective application. That is what occurred here.* [The Company] conceded that [its] agreement with the Union allowed rates to be red-circled for all employees adversely affected by a reduction in force. Unhappy with that consequence of its agreement, [the Company] sought to negotiate a limitation on the term and condition of employment resulting from that agreement, by restoring all qualifications enunciated [in the collective bargaining agreement]. Unable to achieve agreement to that restoration, *[the Company] simply rescinded its August agreement and all benefits already conferred by its terms on employees. As a consequence, the seven power boiler employees and two chip dump Cat operators had their red-circle employment terms erased, as if [the Company] had never agreed to confer that benefit. In so doing, [the Company] violated §§ 8(a)(5) and (1) of the Act.*

(Emphasis added). In a later passage, the ALJ expanded upon, but regrettably did not much clarify, his findings and reasoning:

... [A] party is not free to hold hostage already conferred benefits as a device for compelling the other party to accept future changes in those benefits. *That is, an employer cannot withhold employees' wages for past work, for example, to extract their bargaining agent's agreement to a wage reduction for future work. In the final analysis, that is what occurred here.*

... [The Company] was free to [propose restoring all contractual conditions for red-circle rate benefits.] It was also free to implement that proposal in the future, once it had bargained in good faith to a legitimate impasse. But, *the Act does not allow a party to rescind and withdraw benefits earned prior to agreement or impasse. Nor does it permit a party to utilize withdrawal of already earned benefits to lever concessions from the other party in negotiations. Therefore, by rescinding the red-circle rate benefits already conferred by the August, 1991 agreement, [the Company] violated §§ 8(a)(5) and (1) of the Act and, furthermore, inherently tainted the bargaining and any impasse that otherwise would have resulted from those negotiations.*

(Emphasis added).

The Board reversed in part, and affirmed in part. The Board agreed with the Company that the August 14 red-circle agreement had been confined to the seven former power boiler employees. The Board therefore reversed the ALJ's finding "to the extent that his remedy and Order could be read to include the 2 chip dump CAT operators." Otherwise, and without elaboration, the Board "decided to affirm the [ALJ's] ruling[ ], finding[ ], and conclusion[ ]" that the Company "violated Section 8(a)(5) by revoking its agreement to apply the red-circle provision in the collective-bargaining agreement to employees adversely affected by the shutdown of the [Company's] power boiler operation."

## III. STANDARD OF REVIEW

 A "finding" relates to matters of fact, and we review an agency's factual findings for support by substantial evidence. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). A "basis" for an agency's order relates to the agency's grounds, or reasons, for

reaching the legal rulings and conclusions it did. A reviewing court "must judge the propriety of [agency] action solely by the grounds invoked by the agency," and "that basis must be set forth with such clarity as to be understandable." *SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). In other words, when we review an agency's order for substantial evidence, it is not enough that substantial evidence supports a basis that is invoked for the first time on appeal: there must be substantial evidence to support the basis that was invoked by the agency below. "[A]n agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.' " *Federal Power Comm'n v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)).[3]

## IV. DISCUSSION

■ Because the Board adopted the ALJ's "rulings, findings, and conclusions" as its own, it is to the ALJ's opinion that we turn.

There is no evidence, let alone substantial evidence, that the Company withheld accrued red-circle benefits from its employees. The Board's appellate counsel does not deny this. On one plausible reading of the ALJ's opinion, however, the basis for concluding that the Company violated the Act rests on the erroneous finding that the Company had improperly withheld accrued red-circle benefits from employees.[4]

On this appeal, the Board's appellate counsel argues that a different basis can support the conclusion that the Company violated the

Act. According to the Board's brief describing negotiations that had taken place prior to October 4, although the Company on September 20 did propose "building a fence" around the seven former power boiler employees, it did not propose stripping them of their expanded red-circle benefits altogether. When the Company at last did propose this, on September 26, the proposal was a *fait accompli,* "conveying the Company's determination that negotiations were at an end." Accordingly, the Board's appellate counsel argues that "this case involves a clearcut failure on the part of the Company to bargain about the specific issue of rescinding the August 14 agreement before implementing that change [on October 4] in the [seven former power boiler] employees' terms and conditions of employment."

In response, the Company's appellate counsel argues that the Board's appellate counsel has mischaracterized what its September 20 proposal to "build a fence" around the seven former power boiler employees entailed. According to the Company's appellate counsel, the proposal was that the seven former power boiler employees would retain their expanded red-circle benefits *if, but only if* the Union agreed to "build a fence" around them; and that if the Union refused to "build a fence," the seven former power boiler employees would lose their expanded red-circle benefits.

The administrative opinions below do not clearly support either side's characterization of the negotiations. On page nine of ALJ's opinion, we read that the Company "sought to negotiate a limitation on the term and condition of employment resulting from [the

3. By contrast, when reviewing the decision of a district court, we must affirm if the result is correct, although the lower court relied upon a wrong ground or gave a wrong reason. *See SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *County of Los Angeles v. Sullivan,* 969 F.2d 735, 740 (9th Cir.1992).

4. For example, the ALJ wrote:
 ... [The Company] simply rescinded its August agreement and all benefits already conferred by its terms on employees. As a consequence, the seven power boiler employees and the two chip dump Cat operators had their red-circle employment terms erased, as if [the Company]

had never agreed to confer that benefit. *In so doing,* [the Company] violated §§ 8(a)(5) and (1) of the Act.
 ... [A]n employer cannot withhold employees' wages for past work, for example, to extract their bargaining agent's agreement to a wage reduction for future work. *In the final analysis, that is what occurred here.*
 ... *Therefore,* by rescinding the red-circle rate benefits already conferred by the August, 1991 agreement, [the Company] violated §§ 8(a)(5) and (1) of the Act....
 (Emphasis added).

August 14] agreement[ ], by restoring all qualifications enunciated [in the collective bargaining agreement]" and that the Company rescinded the agreement only after it found itself "[u]nable to achieve agreement to that restoration...." On page 18 of the ALJ's opinion, we read that the Company "returned to the Union and proposed restoring all contractual conditions for red-circle rate benefits." The question is: for whom did the Company propose restoring all contractual conditions? For everyone *but* the seven former power boiler employees (as the Board's appellate counsel argues)? Or for everyone *including* the seven former power boiler employees (as the Company's appellate counsel argues)? We cannot tell.

In any event, the basis for supporting the decision and order now offered by the Board's appellate counsel—that, prior to October 4, the Company failed to bargain over the subject of stripping the seven power boiler employees of expanded red-circle benefits—does not appear to be the same basis offered by the Board in its opinion. It does not appear to be the basis offered by the ALJ in his order, and the Board reversed the ALJ "*only*" to the extent that his remedy and Order could be read to include the 2 chip dump CAT operators." (Emphasis added). The Board otherwise affirmed the ALJ's "rulings, findings, and conclusions." If, as the Board's appellate counsel would have it, the Board intended to uphold the ALJ's order but reject his reasons, it did an inadequate job of making that intention clear.[5] Because the Board professed to decide the case on the ALJ's basis, its decision must be reviewed on the soundness of the ALJ's order.

Under settled principles of administrative law, the Board, not a reviewing court, is charged with deciding which theory of Section 8(a)(5) liability should be pursued. It is not our function to "spell out, to argue, to choose between conflicting inferences," *Sec'y of Agriculture v. United States,* 347 U.S. 645, 654, 74 S.Ct. 826, 832, 98 L.Ed. 1015 (1954), nor to supply a theory that the Board was unable to articulate. We have concluded that the backpay order is insufficiently elaborated to support "appellate counsel's *post hoc* rationalizations" and "falls short of that standard of clarity that administrative orders must exhibit." *Texaco, Inc.,* 417 U.S. at 395–96, 397, 94 S.Ct. at 2325–26 (internal quotations omitted). The backpay order is therefore remanded for further consideration and clarification.

The petition for review is GRANTED, the application for enforcement is GRANTED IN PART and DENIED IN PART, and the cause is REMANDED. No parties to recover costs.

---

**5.** The Board knew how to make known its disagreements with the ALJ. The Board expressly rejected the ALJ's finding that the August 14 agreement applied beyond the seven former power boiler employees; yet it had no criticism for the ALJ's finding that the Company withheld accrued red-circle benefits from its employees.